## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAVID M. OESTREICHER and
ADRIANA GRECI GREEN

                    Plaintiffs,

-vs-                                        Docket No. 02-CV-959

RUTGERS, The State University,
et al.                                      Civil Action


                    Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS CARPENTER, BENNETT & MORRISSEY, IRVING HURWITZ, ESQ. AND LINDA CELAURO, ESQ.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF DAVID OESTREICHER**

---

**RETURN DATE OF MOTION: APRIL 6, 2015**
**ORAL ARGUMENT IS REQUESTED.**

<br>

                                    MORGAN MELHUISH ABRUTYN
                                    651 West Mount Pleasant Avenue
SHAJI M. EAPEN                      Suite 200
Of Counsel and On the Brief         Livingston, NJ 07039
                                    T: 973.994.2500
CHRISTOPHER R. WEISS                F: 973.994.3375
On the Brief                        Attorneys for Defendants,
                                       Carpenter, Bennett &
                                       Morrissey, Irving Hurwitz,
                                       Esq. and Linda Celauro, Esq.
                                    Our File No.:  KEM 18-023 U
                                       EA/SME

{01003621}

## TABLE OF CONTENTS

Table of Authorities...........................................iv

Preliminary Statement..........................................1

Statement of Facts.............................................3

Legal Argument.................................................7

    POINT I

    PLAINTIFF OESTREICHER'S CLAIMS MUST BE DISMISSED
    WITH PREJUDICE BECAUSE HE DID NOT HAVE AN
    ATTORNEY-CLIENT RELATIONSHIP WITH THE CBM
    DEFENDANTS....................................................7

    A.    The Express Actions and Statements of the CBM
        Defendants Did Not Create an Attorney-Client
        Relationship With Oestreicher.........................9

    B.    The CBM Defendants' Representation of Rutgers
        and the Firm's Interactions With Oestreicher
        Did Not Give Rise to an Implied Attorney-
        Client Relationship..................................10

        1.    The CBM Defendants Represented Rutgers and
            Not the Interests of the Students .............11

        2.    An Implied Attorney-Client Relationship
            Did Not Arise From the Interactions
            Between the CBM Defendants and Oestreicher
            During the Dismissal Hearings ................13

            a.    Oestreicher Did Not Rely Upon the CBM
                Defendants to Represent His Interests
                During the Hearings ......................14

b.   The CBM Defendants Could Not Foresee that Oestreicher Would Rely On the Firm to Represent His Interests During the Litigation ...............................19

3.   When the Undisputed Factual Record Evidences the Absence of an Implied Attorney-Client Relationship, an Immaterial Dispute, or Oestreicher's Subjective Belief, is Insufficient to Prevent Summary Judgment ......................22

POINT II

OESTREICHER'S COMPLAINT MUST BE DISMISSED WITH PREJUDICE BECAUSE THE CBM DEFENDANTS DID NOT PROXIMATELY CAUSE ANY DAMAGES............................26

A.   CBM Did Not Proximately Cause Oestreicher to Sustain any Economic Loss Due to the Firm's Involvement in the Dismissal Hearings...............27

1.   Oestreicher's Inability to File Certain Claims Within the Statute of Limitations was Not Due to Any Conduct By CBM .............27

2.   The Settlement of Powers Federal Lawsuit Did Not Create Any Legally Adverse Effect on Oestreicher .................................29

3.   Oestreicher's Claimed Economic Damages are the Result of His Voluntary Decision to Forego Career Opportunities and Immerse Himself in the Instant Litigation....... 31

B.   The CBM Defendants Did Not Proximately Cause

Oestericher to Sustain Any Non-Economic Loss...............................................34

POINT III

OESTREICHER DOES NOT HAVE A VIABLE CLAIM FOR BREACH OF CONSTRUCTIVE TRUST/FIDUCIARY DUTY...............36

POINT IV

THE CLAIMS AGAINST HURWITZ, IN HIS INDIVIDUAL CAPACITY, CONTAIN DEFICIENCIES IN ADDITION TO THE ABOVE CITED ARGUMENTS.....................................39

Conclusion...................................................40

## TABLE OF AUTHORITIES

**Federal Cases**

Alcman Servs. Corp. v. Bullock,
    925 F. Supp. 252 (D.N.J. 1996)...........................26

Ageloff v. Noranda, Inc.,
    936 F. Supp. 72 (D.R.I. 1996)........................ 24,25

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..................................22, 23

Caldwell Trucking PRP Group v. Spaulding Composites Co.,
    890 F. Supp. 1247 (D.N.J. 1995)....................4, 9, 10

Capitol Surgical Supplies, Inc. v. Casale,
    86 Fed. Appx. 506 (3d Cir. 2004)..................8, 23, 24

Ellis v. Ethicon, Inc., 2005 U.S. Dist.
    LEXIS 25705 (D.N.J. Oct. 25, 2005)............8, 13, 19, 24

Essex Chem. Corp. v. Hartford Acc. & Indem. Co.,
    993 F. Supp. 241 (D.N.J. 1998).................8, 9, 13, 24

Fishbein Family Partnership v. PPG Indus., Inc.,
    307 Fed. Appx. 624 (3d Cir. 2009).........................27

Flaherty-Wiebel v. Morris, Downing & Sherred,
    384 Fed. Appx. 173 (3d Cir. 2010).........................8

FMC Corp. v. Guthery, 2009 U.S. Dist.
    LEXIS 14609 (D.N.J. Feb. 24, 2009).......................8

Montgomery Academy v. Kohn,
    50 F.Supp. 2d 344 (D.N.J. 1999).......................8, 13

RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.,
    58 F. Supp. 2d 503 (D.N.J. 1999)......................32, 34

Waterloov Gutter Prot. V. Absolute Gutter Prot.,
    64 F.Sup. 2d 398 (D.N.J. 1999).............................8

**State Cases**

2175 Lemoine Ave. Corp. v. Finco, Inc.,
    272 N.J. Super. 478 (App. Div. 1994).............26, 32, 33

Albright v. Burns, 206 N.J. Super.
    625, 632 (App. Div. 1986)..............................7, 13

Banco Popular N. Am. v. Gandi, 184 N.J. 161 (2005)............20

Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520
    (1995).................................................18, 19

Building Materials Corp. of America v. Allstate Ins. Co.,
    424 N.J. Super. 448 (App. Div. 2012).....................12

Casey v. Univ. of Med. & Dentistry of N.J., 2010 N.J. Super.
    Unpub. LEXIS 1986 (App. Div. August 3, 2010).........17, 20

Cortez v. Gindhart, 435 N.J. Super.
    589 (App. Div. 2014).....................................38

Couri v. Gardner, 173 N.J. 328, 340 (2002)...................38

DeAngelis v. Rose, 320 N.J. Super. 263 (App. Div. 1999)........8

F.G. v. MacDonell, 150 N.J. 550 (1997)................36, 37, 39

Gautam v. De Luca,
    215 N.J. Super. 388 (App. Div. 1987).................34, 35

Geranio v. FEC Mortg. Corp., 2009 N.J. Super.
     Unpub. LEXIS 74 (App. Div. Feb. 18, 2009).............11, 13

Herbert v. Haytaian, 292 N.J. Super.
     426 (App. Div. 1996).......................................13

In re Palmieri, 76 N.J. 51 (1978)..........................10, 14

In re Silverman, 113 N.J. 193 (1988)...........................15

Lamb v. Barbour, 188 N.J. Super. 6 (App. Div. 1982).......26, 39

Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.,
     189 N.J. 436 (2007)...................................22, 23

McCarthy v. John T. Henderson, Inc.,
     246 N.J. Super. 225 (App. Div. 1991).....................11

McGrogan v. Till, 167 N.J. 414 (2001)......................7, 39

McKelvey v. Pierce, 173 N.J. 26 (2002).........................39

Morton Int'l., Inc. v. Ge. Accident Ins. Co. of Am.,
     266 N.J. Super. 300 (App. Div. 1991)
     aff'd 134 N.J. 1 (1993)...............................22, 23

Munoz v. Perla, 2011 N.J. Super.
     Unpub. LEXIS 3096 (App. Div. Dec. 20, 2011)..............37

O'Dowd v. Mandelbaum, 2014 N.J. Super.
     Unpub. LEXIS 2595 (App. Div. Oct. 31, 2014)..........12, 15

Petrillo v. Bachenberg, 139 N.J. 472 (1995)...............15, 20

Picogna v. Bd. of Ed. of Cherry Hill,
     143 N.J. 391 (1996).......................................35

Wang v. Allstate Ins. Co., 125 N.J. 2 (1991)....................8

Winstock v. Galasso, 430 N.J. Super.
    391 (App. Div. 2013)......................................34

**Rules**

R.P.C. 1.13..............................................12

**Statutes**

N.J.S.A. §2A:14-3........................................28

**Other Authorities**

Restatement (Second) of Torts §874.......................36

Restatement (Third) of the Law Governing Lawyers § 96.........12

## PRELIMINARY STATEMENT

Defendants Carpenter, Bennett & Morrissey, Irving Hurwitz, ("Hurwitz"), and Linda Celauro ("Celauro")(collectively "CBM Defendants") move for summary judgment dismissing with prejudice Plaintiff David Oestreicher ("Oestreicher")'s claims of legal malpractice (Count 18) and breach of constructive trust/fiduciary duty (Count 7) against the CBM Defendants. These claims fail as a matter of law due to the lack of an attorney-client relationship and proximate causation.

This case arises out of CBM's representation of Rutgers, The State University of New Jersey ("Rutgers"):

(1) in its dismissal proceedings against former professor, William Powers ("Powers"), due to Powers's inappropriate treatment of current and former graduate students, which proceeded to a hearing before a collegial faculty hearing panel in 1997 to 1998; and

(2) in federal lawsuit brought against Rutgers (and 11 officers and administrators) by Powers in 1996, which was settled in 1998.

Oestreicher, who earned his doctoral degree from Rutgers in 1995, was a witness in the dismissal hearings. Plaintiff Adriana Greci Green ("Green"), who earned her doctoral degree from Rutgers in 2001, was also a witness during the dismissal hearings, and a non-party deponent in the federal lawsuit.

The CBM Defendants did not represent the interests of Oestreicher in connection with the dismissal hearings. They did not have any written or unwritten agreement with Oestreicher, and did not explicitly state that they would represent his interests. The representation the CBM Defendants provided to Rutgers in the dismissal hearings did not create an attorney-client relationship with the students. Moreover, the CBM Defendants did not have an implied attorney-client relationship with Oestreicher because he did not rely upon them and they could not foresee such reliance, in part because he relied on his father, an attorney, for legal advice. Thus, Oestreicher's subjective intent cannot undermine the abundant uncontested facts that evidence the absence of an attorney-client relationship.

Additionally, the CBM Defendants' actions did not proximately cause any damages. The CBM Defendants did not contribute to Oestreicher's alleged failure to pursue certain claims within the statute of limitations, as these claims expired outside the timeframe of CBM's representation of Rutgers in the dismissal hearings. The settlement between Rutgers and Powers also did not have any legally adverse effect on Oestreicher. Further, Oestreicher's claimed economic damages are solely the result of his failure to seek employment, commencing from the time he received his doctoral degree in

1995, two years *before* he met the CBM Defendants, until the present time, a passage of 20 years which Oestreicher has devoted to pursuits of his own choosing, rather than seeking paid employment. Further, Oestreicher has not suffered any legally cognizable non-economic damages. Without a cognizable injury, the CBM Defendants' conduct did not proximately cause any loss.

Oestreicher's claim for breach of constructive trust/fiduciary duty must also be dismissed. The undisputed facts demonstrate that the parties did not have a fiduciary relationship and the CBM Defendants did not proximately cause any damages. Without the presence of these two requisite elements, Oestreicher cannot maintain a viable claim for constructive trust/breach of fiduciary duty.

Moreover, Oestreicher has failed to make any allegations against Hurwitz. Indeed, Hurwitz did not attend any meetings with Oestreicher. Nor did Hurwitz present Oestreicher as a witness during the dismissal hearings. Nor was Hurwitz one of the CBM attorneys who negotiated the settlement agreement, on behalf of Rutgers, with Powers.

## STATEMENT OF FACTS

This lawsuit arises out of CBM's prosecution of Rutgers President's dismissal charges against Powers during a public hearing requested by Powers, before a collegial panel of

Powers's faculty peers. DF¶40.[1] Rutgers also retained CBM to assist in its defense of a federal lawsuit instituted by Powers. DF¶23. Oestreicher, who received his doctoral degree in 1995 from Rutgers, was one of the witnesses during the dismissal hearings. DF¶¶1-2,37.

During the dismissal hearings, the CBM Defendants presented evidence in support of the President's dismissal charges against Powers through documents and numerous witnesses, which included faculty, administrators, and current and former graduate students, such as Oestreicher and Green. DF¶¶41,62. Oestreicher admitted CBM did not provide the witnesses with a retainer agreement, request for payment, or any other express statement that the firm represented their interests. DF¶¶45-55. In fact, Celauro told Oestreicher several times that the firm did not represent the witnesses. DF¶¶73,76,81. Oestreicher admitted he did not solicit legal advice from the CBM Defendants and the firm did not provide such advice. DF¶¶56-58.

Oestreicher admitted he relied upon the legal advice and counsel of his father, Julius Oestreicher, who is an attorney. DF¶¶108-109. He spoke with his father about his involvement in the hearings, as well as prospective claims against Powers.

---

[1] "DF¶" followed by a number refers to a paragraph in "Statement of Material Facts Not in Dispute, in Support of Defendants' Motion for Summary Judgment Against Plaintiff David Oestreicher."

DF¶¶108-109. At one point, Oestreicher refused to speak with CBM until he obtained legal guidance from his father. DF¶112. Julius Oestreicher also informed the Panel that he represented his son and submitted a request to the Panel on Oestreicher's behalf. DF¶¶114-117.

Rutgers and Powers entered into a settlement agreement in June 1998, which resolved the dismissal hearing and federal litigation. DF¶131. Oestreicher then enlisted the services of Emily Alman and Katich, Werse & Petillo ("KWP"), to draft a complaint against Rutgers and Powers. DF¶¶143-149. However, neither Alman nor KWP filed a complaint before the statute of limitations expired with respect to certain claims. DF¶¶143-149.

Thereafter, Oestreicher and several other former graduate students, who had testified during the dismissal hearings, instituted litigation against Rutgers, Powers, Alman, KWP, the CBM Defendants and other entities. DF¶154. In the midst of the litigation, the plaintiffs sought to remove CBM from representing Rutgers because the students believed that the firm previously represented their interests. DF¶151-152,190-201. The plaintiffs filed two separate motions to remove CBM, both of which were denied. DF¶¶152,197. The first motion was denied by Judge Garruto in the Superior Court of New Jersey. DF¶152. The second motion was denied by United States District Judge Cavanaugh ("the Court") after a four-day evidentiary hearing.

DF¶¶192,197. The Court determined that no one from CBM "either expressly or impliedly, in words or substance, led the Plaintiffs to believe that Carpenter, Bennett & Morrissey were their attorneys or representing them in the matter." DF¶199.

In May 2006, Plaintiffs Stephen Yost and Elizabeth Jones Eaker voluntarily dismissed their claims against all of the defendants with prejudice. DF¶203.

In June 2006, the CBM Defendants filed a motion for summary judgment. DF¶204. On November 9, 2006, the Court granted the motion for summary judgment. DF¶205. The Court subsequently denied the plaintiffs' motion for reconsideration and request to certify the order as a final, appealable decision. DF¶¶206-207.

After these rulings, Oestreicher and the two other plaintiffs (Green and Mark Speeney) settled their claims with Rutgers, Powers, Alman and KWP. DF¶¶208-215. The settlement with Rutgers included a payment of $525,000 and the issuance of a public statement that acted as a counterpoint to Powers' criticisms of the students. DF¶¶211-214. The settlement with Powers also prohibited him from speaking about the plaintiffs or interfering with their work. DF¶215.

Oestreicher and the remaining plaintiffs then appealed the Court's decision to the United States Court of Appeals for the Third Circuit, which reversed and remanded for further proceedings. DF¶¶216-217. Although the Third Circuit found that

the Court improperly applied the law of the case doctrine, the Third Circuit did not overturn its factual findings. DF¶219.

Following the appeal, the case was remanded to the Court and discovery was reopened. DF¶220. In July 2014, Plaintiff Mark Speeney voluntarily dismissed his claims against the CBM Defendants with prejudice, which left only Oestreicher and Green as the remaining plaintiffs. DF¶221.

## LEGAL ARGUMENT

### POINT I

**PLAINTIFF OESTREICHER'S CLAIMS MUST BE DISMISSED WITH PREJUDICE BECAUSE HE DID NOT HAVE AN ATTORNEY-CLIENT RELATIONSHIP WITH THE CBM DEFENDANTS.**

Oestreicher's malpractice claims against the CBM Defendants stem from his unfounded, yet immutable, belief that, although he was nothing more than a witness, the CBM firm represented his interests in connection with Rutgers dismissal proceedings against Powers. The elements of a legal malpractice claim are: (1) the existence of an attorney-client relationship that creates a duty of care upon the attorney; (2) the breach of such duty; and (3) proximate causation of damages from the breach. McGrogan v. Till, 167 N.J. 414, 425 (2001); see also Albright v. Burns, 206 N.J. Super. 625, 632 (App. Div. 1986).

This framework evidences that the existence of an attorney-client relationship is a condition precedent to a finding of

legal malpractice. See, e.g., Flaherty-Wiebel v. Morris, Downing & Sherred, 384 Fed. Appx. 173 (3d Cir. 2010); Waterloov Gutter Prot. V. Absolute Gutter Prot., 64 F.Supp. 2d 398, 425 (D.N.J. 1999). In the absence of an attorney-client relationship, Oestreicher's malpractice claims are not legally viable. See DeAngelis v. Rose, 320 N.J. Super. 263, 274 (App. Div. 1999) ("[t]o prevail on a claim of attorney malpractice, a plaintiff must prove the existence of an attorney-client relationship that gives rise to a duty of care"). The determination of whether a duty exists is left to the province of the court. Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991).

An attorney-client relationship can be express or implied. Montgomery Academy v. Kohn, 50 F. Supp. 2d 344, 350 (D.N.J. 1999). Indeed, such relationship "can arise by express contract, court order or implication." Ellis v. Ethicon, Inc., 2005 U.S. Dist. LEXIS 25705, *12 (D.N.J. Oct. 25, 2005). However, an individual's subjective belief is insufficient to demonstrate the existence of an attorney-client relationship. Essex Chem. Corp. v. Hartford Acc. & Indem. Co., 993 F. Supp. 241, 253 (D.N.J. 1998); see also Capitol Surgical Supplies, Inc. v. Casale, 86 Fed. Appx. 506, 509 (3d Cir. 2004); FMC Corp. v. Guthery, 2009 U.S. Dist. LEXIS 14609, *19 (D.N.J. Feb. 24, 2009). Instead, a finding that the relationship was formed must be "objectively reasonable under the totality of the

circumstances, which includes consideration of factors such as intent of the alleged client and attorney . . . ." Essex Chem. Corp., 993 F. Supp. at 253.

Applying the above stated principles to the undisputed facts in this case demonstrates that the CBM Defendants did not have an express or implied attorney-client relationship with Oestreicher. Oestreicher's subjective belief cannot undermine the uncontested facts that evidence the lack of an attorney-client relationship.

**A.    The Express Actions and Statements of the CBM Defendants Did Not Create an Attorney-Client Relationship With Oestreicher.**

The CBM Defendants did not explicitly state that the firm represented Oestreicher, and did not provide Oestreicher with any writing documenting representation. Oestreicher did not receive any retainer agreement or other written representation that set forth the nature or extent of any legal service CBM would provide on his behalf. DF¶45. Oestreicher never received a bill for legal services rendered by CBM, and did not pay money to CBM to procure its representation of him in the dismissal proceedings. DF¶46. Oestreicher understood that the CBM Defendants were paid by Rutgers. DF¶47; see also DF¶48 ("[I]t was clear that the CBM firm had been retained by Rutgers and that Rutgers was paying its fees.").

Moreover, the CBM Defendants never told Oestreicher that the firm represented him personally or his interests in connection with the dismissal hearings. DF¶¶49-51. During the dismissal hearings, Celauro stated several times on the record that CBM did not represent Oestreicher. DF¶¶72,76,81-82. Celauro stated on the record, "I don't represent Adriana Greci Green, nor do I represent Christopher DeFrancisco or any of the other witnesses, I represent the President of the university." DF¶72. Oestreicher was present when Celauro made these statements about the scope of CBM's representation. DF¶¶73,77. Additionally, Celauro spoke with Oestreicher about the purpose of the dismissal proceedings "so it was clear that" he knew "these are not [his] hearings, these are the President's hearings." DF¶81.

Consequently, the express communications between the parties evidence the absence of an attorney-client relationship instead of the presence of such relationship.

**B.   The CBM Defendants' Representation of Rutgers and the Firm's Interactions With Oestreicher Did Not Give Rise to an Implied Attorney-Client Relationship.**

The exchanges between Oestreicher and the CBM Defendants did not provide an objectively reasonable basis for Oestreicher to assume that the firm represented his interests. An attorney-client relationship may arise by implication, even when the attorney's representation is not expressly "articulated in writing or speech." In re Palmieri, 76 N.J. 51, 58-59 (1978).

However, the imposition of an implied attorney-client relationship will only be appropriate when the putative client relies upon the professional skills of the attorney, the attorney is aware of this reliance, and the attorney tacitly accepts the reliance. Geranio v. FEC Mortg. Corp., 2009 N.J. Super. Unpub. LEXIS 74, *9-10 (App. Div. Feb. 18, 2009). Absent reliance by the client, and foreseeability by the attorney, an attorney-client relationship cannot arise by implication.

CBM represented Rutgers, which was separate and distinct from representing the interests of the witnesses during the dismissal hearings. Additionally, Oestreicher did not rely upon CBM and CBM could not foresee that Oestreicher would consider himself to be a client. These unequivocal facts mandate the grant of summary judgment.

1. **The CBM Defendants Represented Rutgers and Not the Interests of the Witnesses.**

The CBM Defendants did not undertake the representation of Oestreicher when the firm decided to represent Rutgers in connection with the dismissal hearings and the federal suit. Indeed, a lawyer's representation of an organization or business is distinct from representation of the owners or beneficiaries of the organization or business. See, e.g., McCarthy v. John T. Henderson, Inc., 246 N.J. Super. 225, 231 (App. Div. 1991) (holding past representation of closely held corporation did not

implicate representation of one of its two shareholders); O'Dowd v. Mandelbaum, 2014 N.J. Super. Unpub. LEXIS 2595, *14 (App. Div. Oct. 31, 2014)(assuming attorney-client relationship between firm and company "would not result in legal representation to the members of the company"); R.P.C. 1.13; Restatement (Third) of the Law Governing Lawyers § 96, cmt. b ("By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals . . . who have an ownership or other beneficial interest in it, such as its shareholders.").

In the dismissal hearings, CBM only represented Rutgers, which did not create an obligation to also represent the witnesses. Nonetheless, Oestreicher unilaterally decided CBM represented his interests solely because CBM represented Rutgers. DF¶¶60-61. Oestreicher's personal belief contradicts the principle that a lawyer's representation of an organization does not equate to representation of the organization's beneficiaries. Moreover, Oestreicher graduated from Rutgers in 1995, two years before the dismissal hearings commenced. DF¶¶1-2,24. Therefore, Oestreicher was not even a matriculated, tuition-paying graduate student during the dismissal hearings. Accordingly, CBM's representation of Rutgers cannot form the basis for an implied attorney-client relationship with Oestreicher.

**2.   An Implied Attorney-Client Relationship Did Not Arise From the Interactions Between the CBM Defendants and Oestreicher During the Dismissal Hearings.**

Before a court finds that an attorney-client relationship was formed by implication, "the Court must consider the potential client's manifestation of intent that the lawyer provide legal services." Ellis, 2005 U.S. Dist. LEXIS 25705 at *13. Further, a member of the bar will only owe a fiduciary duty to those persons "who he knows or should know rely on him in his professional capacity." Albright, 206 N.J. Super. at 633.

As such, an implied attorney-client relationship may only be found when two elements are present: (a) a client's reliance on the professional skills of the attorney; and (b) the attorney's awareness of such reliance and tacit acceptance of same. See Geranio, 2009 N.J. Super. Unpub. LEXIS 74, at **9-10; see also Montgomery Academy, 50 F. Supp. 2d at 350 (articulating similar reliance and foreseeability test to determine existence of implied relationship for disclosure of confidential information); Herbert v. Haytaian, 292 N.J. Super. 426, 436 (App. Div. 1996) (using similar reliance test to determine whether implied relationship arose in context of legal advice). Also, the finding of an implied relationship must be objectively reasonable under the circumstances. See Essex Chem. Corp., 993 F. Supp. at 253; Ellis, 2005 U.S. Dist. LEXIS 25705 at *12.

{01003621}                          13

The record evidence unequivocally shows that Oestreicher did not rely upon the CBM Defendants to act as his attorneys, and the CBM Defendants could not anticipate that Oestreicher placed any reliance on the firm. Consequently, the two elements required to establish an implied attorney-client relationship are not present. Without reliance and foreseeability, an implied attorney-client relationship did not exist between Oestreicher and the CBM Defendants.

### a. Oestreicher Did Not Rely Upon the CBM Defendants to Represent His Interests During the Hearings.

"Before a professional obligation is created, there must be some act, some word, some identifiable manifestation that the reliance on the attorney is in his professional capacity." Palmieri, 76 N.J. at 60. Throughout the dismissal hearings, the words, actions and manifestations of Oestreicher evidenced that he did not rely upon CBM to represent his interests. Specifically, Oestreicher was represented by independent counsel during the proceedings. He did not challenge CBM when the firm announced that it did not represent him. He did not solicit legal advice from CBM. He understood that he did not have authority to terminate the firm's representation. These actions show an absence of reliance, which completely undermines the existence of an implied attorney-client relationship.

The existence of an implied attorney-client relationship with one firm will be rebutted when the putative client obtains representation from another firm. See, e.g., In re Silverman, 113 N.J. 193, 219 (1988) (finding claim of attorney-client relationship rebutted by client's decision to retain independent counsel and other outside legal advice); see also O'Dowd, 2014 N.J. Super. Unpub. LEXIS 2595 at *20 ("[W]e find that remoteness exists because plaintiff was represented by his own counsel and . . . summary judgment was properly granted as the Firm owed no duty to plaintiffs."). An implied attorney-client relationship cannot arise if a non-client is "too remote from the attorneys to be entitled to protection." Petrillo v. Bachenberg, 139 N.J. 472, 483-484 (1995). In this context, a non-client's relationship with a putative attorney is too remote if the non-client obtains representation from independent counsel. See O'Dowd, 2014 N.J. Super. Unpub. LEXIS 2595, at *20. The presence of independent counsel obviates a non-client's need to obtain legal advice and rely upon the representations of another attorney. Id. at *19 ("Plaintiff did not need to rely on the Firm for legal advice [as] Plaintiff had his own counsel.").

Oestreicher was represented by his attorney-father, Julius Oestreicher, throughout the dismissal proceedings. Before his testimony at the hearings, Oestreicher spoke with his father about his role in the proceedings and the possibility of

pursuing a lawsuit against Powers. DF¶¶108-109. During the hearings, Oestreicher identified his father as his counsel and refused to discuss certain issues with the CBM Defendants until he obtained guidance from his father. DF¶112. Julius Oestreicher also attended and recorded the hearings. DF¶110.

Further, Julius Oestreicher wrote a letter to the Panel "as Attorney for [his] son David Oestreicher." DF¶114. The letter advocated for the admission of certain documents into the record to refute attacks on Oestreicher's academic work. DF¶116. Notably, Julius Oestreicher identified CBM as "[c]ounsel for the University" and was not certain if Rutgers attorneys would even support his position. DF¶¶115,117. The hearing panel noted on the record that they "had a fax from Mr. Julius Oestreicher, attorney and father for David Oestreicher." DF¶119.

Oestreicher's reliance upon his father's representation demonstrates that his relationship with the CBM Defendants was too remote to impose a duty of care. Prior to the initiation of the dismissal proceedings and his introduction to CBM, Oestreicher and his father spoke with other attorneys about the extent of his putative claims against Powers instead of the CBM Defendants. DF¶¶6-9. When he was concerned about the progression of the proceedings, he refused to speak with the CBM Defendants until he obtained legal guidance from his father. When he was concerned about the admission of certain evidence,

he enlisted the services of his father to draft a letter on his behalf. Notably, Oestreicher did not rely upon the CBM Defendants to undertake these endeavors, even though he believed that such actions were beneficial to his interests. Oestreicher's continual reliance upon his father throughout the dismissal hearings undermines his current contention that an implied attorney-client relationship existed with CBM.

The possibility that Oestreicher relied upon the actions of CBM is further diminished by the express statements the CBM Defendants made during the hearings. A non-client cannot reasonably rely upon an attorney who informs the non-client that the attorney does not represent their interests. See Casey v. Univ. of Med. & Dentistry of N.J., 2010 N.J. Super. Unpub. LEXIS 1866 (App. Div. Aug. 3, 2010).

When the dismissal hearings began, Celauro stated on the record that CBM did not represent Oestreicher. DF¶72. Celauro reaffirmed this statement at the following hearing, when counsel for Powers wanted to ask a witness about his communication with CBM. DF¶76. Oestreicher was present when Celauro made both of these statements. DF¶¶73,77. Yet, he did not approach Celauro to express his disagreement with these statements or seek a clarification about the scope of CBM's representation. DF¶74.

These statements should have alerted Oestreicher about the scope of CBM's representation, and eliminated his alleged

reliance on this firm. These statements should have prompted Oestreicher to speak with Celauro and clarify the extent of the firm's representation. This Court should not reward Oestreicher's decision to disregard objective facts. The express statements of the CBM Defendants evidence that an attorney-client relationship should not be implied.

Moreover, Oestreicher did not solicit any legal advice from the CBM Defendants, which further demonstrates that he did not rely upon the firm in its professional capacity. Throughout the dismissal hearings, CBM never provided him with any legal advice or guidance. DF¶57. He did not even consider discussing his potential claims against Powers with the CBM Defendants. DF¶58. He did not believe that the CBM Defendants were able to provide him with legal advice, outside the context of the dismissal hearings. DF¶56. Instead, Oestreicher obtained advice and guidance from his father. DF¶¶108-109,112. Oestreicher's failure to solicit advice from CBM provides another indication that he did not rely upon the firm to represent his interests.

Oestreicher also did not undertake any efforts to sever his supposed relationship with CBM after he became dissatisfied with the firm. Oestreicher was displeased with the firm's failure to utilize the unsolicited information that he provided. DF¶¶103-105. He acknowledged that "the lawyers of course work for the University" and were not interested in presenting certain

evidence which he believed was important. DF¶105. Despite his frustration, he did not undertake any efforts to terminate his alleged attorney-client relationship with CBM. DF¶106. Moreover, he did not believe that he had the authority to undertake such action. DF¶107. Oestreicher's inability to terminate CBM's services or influence the scope of the firm's representation evidences the absence of an attorney-client relationship.

The undisputed facts show that Oestreicher could not have reasonably relied on the CBM Defendants in their professional capacity. He had an attenuated relationship with the CBM Defendants, due to his reliance upon his father. The CBM Defendants specifically informed him that CBM did not represent his interests. He did not believe that he could obtain legal advice from them or terminate the alleged representation. Consequently, Oestreicher did not rely upon CBM to represent his interests, which eliminates any implied attorney-client relationship.

> **b. The CBM Defendants Could Not Foresee that Oestreicher Would Rely On the Firm to Represent His Interests During the Litigation.**

A lawyer's duty to a non-client is typically limited to "situations in which the lawyer intended or should have foreseen that the third party would rely on the lawyer's work." Petrillo, 139 N.J. at 482; see also Ellis, 2005 U.S. Dist. LEXIS 25705 at *13. If an attorney induces a non-client to reasonably

rely on the attorney's representations, then an implied attorney-client relationship may arise. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 180 (2005). However, "if the attorney does absolutely nothing to induce reasonable reliance by a third party, there is no relationship to substitute for the privity requirement." Id.

The above stated principles allude to foreseeability, the second element required to create an implied attorney-client relationship. Consideration of the attorney's conduct ensures that courts "cabin the lawyer's duty, so the resulting obligation is fair to both lawyers and the public." Petrillo, 139 N.J. at 484. The CBM Defendants did not engage in any conduct to induce Oestreicher to rely upon the representations of the firm.

For example, the CBM Defendants made several express statements that evidence the firm did not intend to induce Oestreicher to rely upon its work, and the firm could not foresee the possibility of such reliance. An attorney cannot foresee that an individual will rely upon their work, when the attorney expressly states that they do not represent the individual's interests. See Casey, 2010 N.J. Super. Unpub. LEXIS 1866 at *13 ("If Timpone advised Casey that UMDNJ, not Casey, was MDMC's client, then any conduct implying otherwise, short of retraction, could not defeat Timpone's express denial of the

acceptance of any professional responsibility as to Casey."). The CBM Defendants advised Oestreicher that the firm represented Rutgers not him. DF¶¶72,76,81-82. The CBM Defendants did not retract these statements at any time. DF¶¶49-51. Thus, any conduct by the firm that allegedly implied an attorney-client relationship cannot override the firm's express denial of the existence of such relationship. Additionally, the CBM Defendants did not provide Oestreicher with any legal advice or directives during the dismissal proceeding. DF¶¶56-58. He did not even solicit any such advice from the CBM Defendants. DF¶57. Rather, Oestreicher's utilizing independent counsel during the dismissal proceedings only further undermines the possibility that his reliance on the CBM Defendants was foreseeable. Indeed, Oestreicher informed the CBM Defendants that he had received legal guidance from his father and independent counsel. DF¶¶6-9. When Oestreicher was concerned about protecting his legal rights, he enlisted the services of his father. DF¶¶108-109,112. The CBM Defendants could not foresee that he relied upon them when he actively sought guidance from other counsel. The CBM Defendants could not conclude that he relied upon their work, while other attorneys were providing him with legal services. As Oestreicher did not directly rely upon CBM for legal services or advice, he could not have an implied attorney-client relationship with the firm.

The CBM Defendants did not engage in any conduct to induce Oestreicher to rely upon the representation of the firm. Accordingly, the CBM Defendants could not foresee that Oestreicher would rely upon their work, and the absence of this foreseeability prohibits the formation of an implied attorney-client relationship.

3. **When the Undisputed Record Evidences the Absence of an Implied Attorney-Client Relationship, an Immaterial Dispute, or Oestreicher's Subjective Belief, is Insufficient to Prevent Summary Judgment.**

Despite the objective facts that undermine the existence of an attorney-client relationship, Oestreicher continues to allege that the CBM Defendants represented him during the dismissal hearings. The Court cannot give credence to Oestreicher's mistaken belief and "ignore reality," when the evidence in the record "is so one-sided." See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 450 (2007). Indeed, a single discrepancy in the factual record, or a person's subjective belief, cannot defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986); see also Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am., 266 N.J. Super. 300, 330 (App. Div. 1991), aff'd, 134 N.J. 1 (1993) (finding that "subjective intent may not be controlling when the undisputed facts reveal otherwise").

As the evidence in this matter is so one-sided, the CBM Defendants must prevail as a matter of law. Anderson, 477 U.S. at 252. Although Oestreicher contends that Celauro wrote "attorney-client privilege" on a document that he authored, this morsel of information cannot compete with the mountain of evidence that demonstrates the absence of an attorney-client relationship.[2] Indeed, both New Jersey federal and state courts have held that a single disputed fact cannot permit the court to ignore an evident reality. See, e.g., Casale, 86 Fed. Appx. at 509 (finding dispute over minor issues in matter was insufficient to show attorney-client relationship in light of undisputed facts); Morton Int'l, Inc., 266 N.J. Super. at 330; Liberty Surplus Ins. Corp., 189 N.J. at 450 (refusing to ignore one-sided nature of matter despite presence of contested fact).

The above stated authorities show that a mere dispute cannot derail a properly supported motion for summary judgment. When presented with this same issue, the Court concluded that

---

[2] Celauro disputes writing the phrase "attorney-client privilege" on this document or even seeing that phrase on this document until the students filed suit against Rutgers. DF¶¶88,93-94. This is the same document which Oestreicher admitted he shared with Rutgers administrators and current and former graduate students before he showed it to Celauro on July 10, 1997. DF ¶89. This is the same document which Oestreicher did not mention in his voluminous diaries and journals until 10 months later in May 1998. DF¶92. This is also the same document that Oestreicher said he took back from CBM because it contained a lie by him. DF¶96. However, the resolution of this immaterial fact dispute is not necessary for the grant of summary judgment to the CBM Defendants.

the "attorney-client" document, "taken in conjunction with all other surrounding circumstances . . . would not give rise to a reasonable belief of implied representation." DF¶201. As set forth in the previous sections, Oestreicher did not retain CBM, he did not pay for legal services, he could not terminate the legal representation, he did not solicit legal advice, he obtained independent legal guidance and the CBM Defendants expressly told him that the firm did not represent his interests.    DF¶¶6-9,45-52,56-58,72-77,81-83,106-119.    These undisputed facts cannot be undermined by a single contested writing. Even if Celauro had written the phrase "attorney-client privilege" on a single document, this fact must be viewed in conjunction with all of the other evidence. When the evidence is viewed together, it is clear that there was no implied attorney-client relationship.

Moreover, Oestreicher's subjective belief is not enough to prove the existence of an attorney-client relationship. See Essex Chem. Corp., 993 F. Supp. at 253; Casale, 86 Fed. Appx. at 509; Ellis, 2005 U.S. Dist. LEXIS 25705 at *12. Instead, a person's belief "must be objectively reasonable under the totality of the circumstances, which includes consideration of factors such as intent of alleged client and attorney and payment arrangements." Essex Chem. Corp., 993 F. Supp. at 253 (citing Ageloff v. Noranda, Inc., 936 F. Supp. 72, 76 (D.R.I.

1996. As noted above, Oestreicher could not reasonably rely upon the CBM Defendants to represent his interests. Additionally, the CBM Defendants could not foresee the possibility of such reliance.

The two courts which previously reviewed this issue similarly determined that Oestreicher's subjective belief cannot create an attorney-client relationship, when the belief is unsupported by the factual record. DF¶¶152,192-201. Indeed, the state court found that "there is no reasonable basis to conclude that there was an attorney-client relationship between plaintiffs and Carpenter, Bennett & Morrissey." DF¶152. After a four day hearing which included Oestreicher's testimony DF¶¶192-195, this Court found that no one from CBM, "either expressly or impliedly, in words or substance, led the Plaintiffs to believe that Carpenter, Bennett & Morrissey were their attorneys or representing them in this matter." DF¶199.

This Court should find that a single discrepancy, or Oestreicher's subjective belief cannot inhibit the entry of summary judgment. As the Court astutely noted, Oestreicher "did not hire Carpenter Bennett, [he] could not fire them, there's no retainer agreement, there's no bills, there's no payment, and there's nothing in writing that even remotely suggests such a relationship from any of the parties." DF¶198. Accordingly, the

one-sided nature of the objective facts demonstrates that summary judgment is proper in this matter.

## POINT II

**OESTREICHER'S COMPLAINT MUST BE DISMISSED WITH PREJUDICE BECAUSE THE CBM DEFENDANTS DID NOT PROXIMATELY CAUSE ANY DAMAGES.**

In a legal malpractice action, a plaintiff must establish that he suffered damages proximately caused by the lawyer's negligence. See Lamb v. Barbour, 188 N.J. Super. 6, 12 (App. Div. 1982). Indeed, the general rule is that an attorney is "only responsible for a client's loss if that loss is proximately caused by the attorney's legal malpractice." 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 487 (App. Div. 1994); see also Alcman Servs. Corp. v. Bullock, 925 F. Supp. 252, 257 (D.N.J. 1996) ("Even if a lawyer's malpractice is obvious, a client may not prevail in a suit against the lawyer where . . . no damages were caused by the lawyer's negligence."). An attorney's malpractice will be considered the proximate cause of a client's damages "where the negligent conduct is a substantial contributing factor in causing the loss." 2175 Lemoine Ave. Corp., 272 N.J. Super. at 487.

Oestreicher claims that the CBM Defendants prevented him from timely pursuing defamation claims against Powers, exposed him to criticism at the dismissal hearings and forced him to forego career opportunities while he pursued claims against the

firm. DF¶¶161-171. Oestreicher also alleges that he has suffered aggravation while the events unfolded. DF¶¶166,169. However, these alleged economic and non-economic damages were not proximately caused by the CBM Defendants. Without the requisite proof of proximate cause, Oestreicher does not have a viable legal malpractice claim.

**A.   CBM Did Not Proximately Cause Oestreicher to Sustain any Economic Loss Due to the Firm's Involvement in the Dismissal Hearings.**

As discussed below, Oestreicher has failed to set forth any evidence that he has sustained economic damages that were proximately caused by the CBM Defendants.

**1.   Oestreicher's Inability to File Certain Claims Within the Statute of Limitations was Not Due to Any Conduct By CBM.**

Oestreicher's failure to pursue certain claims against Rutgers and Powers within the statute of limitations cannot be attributed to the CBM Defendants, because the statutes expired outside the timeframe when CBM purportedly represented him. Notably, the statute of limitations for certain claims expired before Oestreicher met the CBM Defendants, which evidences that the CBM Defendants could not be liable for Oestreicher's failure to timely file these claims. See Fishbein Family Partnership v. PPG Indus., Inc., 307 Fed. Appx. 624 (3d Cir. 2009) (holding that when statute of limitations ran before attorney was hired, that attorney and law firm cannot be held liable for legal

malpractice). To the extent that additional defamation claims accrued during the dismissal hearings, these claims expired at least nine months after CBM's purported representation ended, and when Oestreicher was represented by other counsel.

Oestreicher's initial defamation claims against Powers and Rutgers accrued between 1993 and 1995. DF¶163. Consequently, these defamation claims expired in 1996 at the latest. N.J.S.A. § 2A:14-3 (one year statute of limitation for defamation claims). The dismissal hearings, and CBM's purported representation, did not arise until after the President of Rutgers issued a dismissal letter to Powers in January 1997. DF¶24. Thus, Oestreicher's initial defamation claims expired before CBM's purported representation began, and while Oestreicher was indisputably being advised by his attorney-father and other attorneys about defamation claims. DF¶¶6-9.

Additionally, the statute of limitations for any claims that may have accrued during the dismissal hearings would have expired almost one year after the hearings, and CBM's purported representation, concluded. Such claims would emanate from the testimony of Powers in March 1998, the testimony of Bonnie Withoff in May 1998, and an article that Powers published in April or May 1998. DF¶¶163-164. Consequently, these claims for defamation would expire between March 1999 and May 1999. N.J.S.A. § 2A:14-3. The dismissal hearings were concluded in

June 1998, when Rutgers and Powers entered into a settlement agreement. DF¶131. Thus, CBM's alleged representation of the witnesses ended months before the statute of limitations for Oestreicher's second set of defamation claims expired. Well within the statute, Oestreicher had already retained Alman, in August of 1998, "who assured him she would meet all relevant statutes of limitation and file a Complaint by sometime in December 1998." DF¶144.

Thus, Oestreicher's failure to timely pursue his claims against Rutgers and Powers was not proximately caused by CBM. His claims initially expired before CBM became involved with the dismissal hearings. His remaining claims expired months after CBM's involvement with the dismissal hearings ceased.

## 2. The Settlement of Powers Federal Lawsuit Did Not Create Any Legally Adverse Effect on Oestreicher.

Although Oestreicher was displeased with the settlement between Rutgers and Powers, which resolved the dismissal hearings and the federal lawsuit, his personal dissatisfaction with the settlement does not constitute a cognizable injury. Oestreicher could not obtain any relief from the disposition of the dismissal hearing or the federal lawsuit to which he was not a party. Oestreicher recognized that the outcome of the dismissal proceedings was uncertain. Also, the settlement did not preclude Oestreicher from subsequently suing Powers and

Rutgers, wherein he obtained a significant recovery and a counterpoint to any prior criticism from Powers.

As Oestreicher could not obtain relief from the dismissal hearings, he could not have been injured from the resolution of these hearings. Oestreicher understood that the hearings were limited to a determination regarding the dismissal of Powers. DF¶33. Oestreicher also knew that he was merely a witness to these proceedings, and he voluntarily participated. DF¶¶64-66,81-83. He did not sustain a cognizable injury from the resolution of the hearings because he did not have a legal interest in these proceedings. During the dismissal proceedings, Oestreicher testified under oath, on September 26, 1997, that had had obtained his doctoral degree, achieved success, and accomplished the things which he wanted to accomplish, losing only several years due to Dr. Powers. DF¶65. Oestreicher testified that his main motivation for testifying in the dismissal hearings was, not for his own benefit, but "because of the students who weren't as fortunate" as him. DF¶66.

The outcome of the dismissal hearings was uncertain at the time of the settlement. Absent settlement, the Panel would have to render a recommendation about the dismissal of Powers, which was unknown at the time. DF¶¶138-139. The Panel's recommendation could have been rejected by the Board of Governors. DF¶141. Thus, Oestreicher cannot assert a viable injury because Rutgers

and Powers agreed to resolve a disputed and uncertain litigation.

The settlement between Rutgers and Powers did not prevent Oestreicher from successfully pursuing claims against both of these entities. After the settlement of the dismissal proceedings, Oestreicher filed suit against Rutgers and Powers. DF¶¶147-148. In 2007, Oestreicher and two other plaintiffs settled claims against these entities, wherein the plaintiffs received $525,000. DF¶¶210-211. The settlement included a publication of a press release from Rutgers that "exonerate[ed] the [plaintiffs] from any accusations that might have been made by anyone, including Powers." DF¶212. Oestreicher confirmed that this statement "did clear [his] name by (sic) the charges issued by Professor Powers." DF¶214. The settlement also prohibited Powers from speaking about the plaintiffs. DF¶215.

Thus, CBM did not proximately cause any injury to Oestreicher when it carried out the decision of Rutgers to settle the dismissal proceedings. He did not have a legal interest in the dismissal hearings. He was able to pursue claims against both Rutgers and Powers after the settlement. Thus, the settlement did not cause an ascertainable loss.

**3. Oestreicher's Claimed Economic Damages are the Result of His Voluntary Decision to Forego Career Opportunities and Immerse Himself in the Instant Litigation.**

In addition to the previously cited misunderstandings, Oestreicher wrongfully claims that the CBM Defendants are responsible for his failure to pursue an academic career. DF¶¶166-171. Oestreicher claims his involvement with the instant matter has precluded him from advancing his career. DF¶¶166-171. However, Oestreicher failed to pursue an academic career long before he met the CBM Defendants. From the time he received his doctoral degree in 1995, two years prior to his meeting the CBM attorneys in 1997, until the present time, Oestreicher has never made any applications to any colleges, universities, or academic institutions to become a professor, or for any other job for that matter. DF¶174. It would appear that Oestreicher's lack of need to pursue wage-earning opportunities, even before he met the CBM attorneys, stems in large part, from his receipt of a steady income from a family business, and his residing with his parents and adult siblings well into his late 30s. DF¶175. Consequently, Oestreicher's economic opportunities have been hampered by his own decisions over the past 20 years since he was awarded his doctoral degree.

New Jersey courts have determined that an attorney's conduct will not proximately cause an injury when there is an attenuated connection between the conduct and the alleged harm. See, e.g., RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co., 58 F. Supp. 2d 503, 527 (D.N.J. 1999) (explaining that

attorney cannot be responsible for intervening harm); 2175 Lemoine Ave. Corp., 272 N.J. Super. at 488 (noting that proximate cause cannot be based on conjecture or suspicion). An attorney's alleged malpractice must be a "substantial contributing factor in causing the loss." 2175 Lemoine Ave. Corp., 272 N.J. Super. at 487. Contrary to these principles, Oestreicher seeks to hold the CBM Defendants responsible for his voluntary decision to not pursue employment and immerse himself in other activities, including this case.

As Oestreicher voluntarily chose not to pursue employment, the CBM Defendants cannot be legally responsible for the consequences of this choice. He cannot identify any economic damages that were caused by the conduct of the CBM Defendants. DF¶¶172-180. He did not lose any contract for an academic position and he was never rejected from any position as a professor, lecturer or curator. DF¶¶172,176. Oestreicher did not submit any applications to any colleges, universities, or academic institutions to become a professor. DF¶174. He did not apply for a full-time position at any museum or university. DF¶177. He did not make any effort to obtain permanent employment either on the faculty of an educational institution or anywhere since completing his education in 1995. DF¶178.

While Oestreicher claims that he has been damaged by his obsession with the instant case, DF¶¶168-171, and "fighting to

clear [his] name," he conveniently forgets that a statement issued by Rutgers over seven years ago "did clear [his] name." DF¶¶168,214. Moreover, Oestreicher admitted during the dismissal hearings in 1997 that he obtained his doctoral degree, achieved success, and accomplished the things which he wanted to accomplish, losing only several years due to Powers. DF¶65. The above referenced cases illustrate that an attorney cannot be liable for harms caused by intervening conduct. See, RTC Mortg. Trust 1994 N-1, 58 F. Supp. 2d at 527. Oestreicher's decision to postpone his work constitutes an intervening action that caused his current predicament.

Accordingly, Oestreicher's alleged economic damages are the result of his voluntarily decisions and were not proximately caused by the CBM Defendants.

**B.   The CBM Defendants Did Not Proximately Cause Oestreicher to Sustain Any Non-Economic Loss.**

In a legal malpractice action, "damages should be generally limited to recompensing the injured party for his economic loss." Gautam v. De Luca, 215 N.J. Super. 388, 399 (App. Div. 1987). Consequently, "emotional distress damages should not be awarded in legal malpractice cases at least in the absence of egregious or extraordinary circumstances." Id.; see also Winstock v. Galasso, 430 N.J. Super. 391, 418-19 (App. Div. 2013). Even if emotional distress damages were recoverable,

"such awards would be impermissible in the absence of medical evidence establishing substantial bodily injury or sever and demonstrable psychiatric sequelae." <u>Gautam</u>, 215 <u>N.J.</u> <u>Super</u>. at 399-400. Further, non-economic damages attributable to "litigation-induced stress," are not recoverable. <u>See</u> <u>Picogna v. Bd. of Ed. of Cherry Hill</u>, 143 <u>N.J.</u> 391, 399 (1996) (holding that a "plaintiff may not recover for litigation-induced distress as a separate component of damages").

Oestreicher cannot recover non-economic damages in this matter because the CBM Defendants did not commit an egregious act and Oestreicher did not sustain verifiable emotional distress. The CBM Defendants repeatedly informed him that CBM did not represent his interests. DF¶¶72-82. Instead, he was represented by his father. DF¶¶108-119. In light of the attenuated relationship between Oestreicher and CBM, any alleged misconduct by CBM could not rise to such an extreme level that would warrant the imposition of non-economic damages. Moreover, Oestreicher did not present evidence of medical treatment to resolve any alleged emotional distress. In the absence of such medical evidence, Oestreicher cannot recover non-economic damages in this matter. <u>See</u> <u>Gautam</u>, 215 <u>N.J.</u> <u>Super</u>. at 399-400.

Additionally, Oestreicher's specific non-economic damages are attributed to his "litigation-induced stress," which is not a recognized legal injury. <u>See</u> <u>Picogna</u>, 143 <u>N.J.</u> at 399. The

Court explained that anxiety and stress may be unavoidable consequences of litigation, but individuals "choose[] to pursue litigation cognizant of both the economic and emotional costs that it will entail." Id. at 399. As such, the individual will bear the burden of these consequences. Id. at 393-399.

Oestreicher claims that he sustained litigation-induced stress during the dismissal hearing and this subsequent action against the CBM Defendants. However, these non-economic damages are not recoverable because Oestreicher consciously decided to participate in both proceedings. He voluntarily decided to testify in the dismissal hearings. DF¶¶64-66. He decided to file this action. As he decided to pursue litigation, cognizant of the risks it entails, he cannot recover damages from the CBM Defendants for any stress that arises from the litigation. Thus, the CBM Defendants did not proximately cause Oestreicher to sustain any non-economic damages.

POINT III

**OESTREICHER DOES NOT HAVE A VIABLE CLAIM FOR BREACH OF CONSTRUCTIVE TRUST/FIDUCIARY DUTY.**

In order to establish a claim of breach of constructive trust/fiduciary duty, a plaintiff must show the existence of a fiduciary relationship and "harm resulting from a breach of the duties imposed by the existence of such a relationship." F.G. v. MacDonell, 150 N.J. 550, 563 (1997) (citing Restatement (Second)

of Torts §874)). The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. Munoz v. Perla, 2011 N.J. Super. Unpub. LEXIS 3096 (App. Div. Dec. 20, 2011); see also F.G., 150 N.J. at 565. The presence of trust, confidence and unequal positions of the parties creates a duty upon one party "to act for or give advice for the benefit of another on matters within the scope of their relationship." F.G., 150 N.J. at 563.

Oestreicher did not place any trust or confidence in the CBM Defendants to warrant the imposition of a fiduciary relationship. Although Oestreicher claims that he entrusted the CBM Defendants with "his causes of action arising from the misconduct of William Powers," the undisputed facts demonstrate the absence of such trust. DF¶¶6-9,33-34,56-59,64-66,74,108-119,159. He never sought advice from the CBM Defendants, or even considered speaking with them, about potential lawsuits that he may file against Powers. DF¶¶56-59. He did not even believe that the CBM Defendants were available to provide such legal advice. DF¶56. He spoke with his father/attorney, Alman, and independent counsel about filing suit against Powers and Rutgers around this time. DF¶¶6-9,59. Thus, Oestreicher did not place trust or confidence in the CBM Defendants to pursue any causes of action on his behalf.

Also, Oestreicher knew that the dismissal hearings were not an adjudication of his cause of action against Powers. Oestreicher understood that the parties to the hearings were Rutgers and Powers, and he was merely a witness to these proceedings. DF¶¶36-37,64-66,81-83. He knew that the authority of the faculty panel was limited to a determination regarding the dismissal of Powers. DF¶33. Further, Oestreicher did not have any factual basis to conclude that the faculty panel could award money to the students or order Powers to apologize to the students. DF¶34. As such, Oestreicher's interaction with the CBM Defendants during the dismissal hearings cannot show that he entrusted the CBM Defendants with his separate and independent claims.[3]

Aside from the absence of a fiduciary relationship, the undisputed facts also demonstrate that the conduct of the CBM Defendants did not proximately cause any injury to Oestreicher. See Legal Argument Section, Point II, supra. Without the presence of harm resulting from the breach of the alleged duty, Oestreicher does not have a viable claim under Count 7. See

---

[3] To the extent that Oestreicher bases this claim upon the belief that the CBM Defendants represented his interests, Count 7 would be the equivalent of a legal malpractice claim. See Couri v. Gardner, 173 N.J. 328, 340 (2002) ("It is not the label placed on the action that is pivotal, but the nature of the legal injury."); see also Cortez v. Gindhart, 435 N.J. Super. 589, 608 (App. Div. 2014). In such instance, Count 7 must still be dismissed due to the absence of an attorney-client relationship. See Legal Argument Section, Point I, supra.

McKelvey v. Pierce, 173 N.J. 26, 57 (2002) (noting party may only be liable for harm that results from breach of fiduciary duty). Indeed, Oestreicher's inability to identify damages that are proximately caused by the CBM Defendants is fatal to both his legal malpractice and breach of fiduciary duty claims.

Accordingly, this claim must be dismissed with prejudice.

### POINT IV

**THE CLAIMS AGAINST HURWITZ, IN HIS INDIVIDUAL CAPACITY, CONTAIN DEFICIENCIES IN ADDITION TO THE ABOVE CITED ARGUMENTS.**

Although Oestreicher has not set forth viable claims against any of the CBM Defendants, claims against Hurwitz are additionally ripe for dismissal because Hurwitz did not: attend any meetings with Oestreicher; present Oestreicher as a witness during the dismissal hearings; or the settlement agreement, on behalf of Rutgers, with Powers. DF ¶¶100,136.

A claim for legal malpractice and a claim for constructive trust/breach of fiduciary duty, are both dependent upon the existence of a duty and a subsequent breach of that duty. See McGrogan, 167 N.J. at 425 (setting forth elements for legal malpractice claim); F.G., 150 N.J. at 563 (discussing elements for breach of fiduciary duty claim). Additionally, a plaintiff cannot establish either claim without showing damages that are proximately caused by the defendant's breach. See Lamb, 188 N.J. Super. at 12; McKelvey, 173 N.J. at 57. Oestreicher alleges that

he sustained injuries due to his testifying in the dismissal hearings and the subsequent settlement between Rutgers and Powers. DF¶¶162-167. However, Hurwitz did not: attend any meetings with Oestreicher; present Oestreicher as a witness during the dismissal hearings; or the settlement agreement, on behalf of Rutgers, with Powers. DF ¶¶100,136.

The undisputed facts, coupled with Oestreicher's claimed injuries, evidence that Hurwitz did not breach any alleged duty or proximately cause any damages.

### CONCLUSION

Based on the foregoing, this Court must dismiss Oestreicher's Complaint against the CBM Defendants with prejudice.

**MORGAN MELHUISH ABRUTYN**
Attorneys for Defendants
Carpenter, Bennett & Morrissey,
Irving Hurwitz, Esq., and Linda
Celauro, Esq.

By:_/s/ Shaji M. Eapen_____
      SHAJI M. EAPEN

Dated: March 2, 2015