**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————
                           :
**DAVID M. OESTREICHER and**    :      **Civil Action No. 02-959 (MCA)**
**ADRIANA GRECI GREEN,**       :
                           :
     **Plaintiffs,**           :
                           :
        **v.**               :
                           :          **OPINION**
**RUTGERS, The State University,**  :
**et al.,**                        :
                           :
     **Defendants.**          :
—————————————————————:

ARLEO, UNITED STATES DISTRICT JUDGE

This matter comes before the Court upon the Motions for Summary Judgment of Defendants Carpenter, Bennett & Morrisey ("CBM"), Irving Hurwitz, Esq. ("Hurwitz"), and Linda Celauro, Esq. ("Celauro") (collectively, "Defendants" or "CBM") against Plaintiff David Oestreicher ("Oestreicher") and Plaintiff Adriana Greci Green ("Green"). Dkt. Nos. 198, 199. Plaintiffs oppose the motions. Dkt. Nos. 201, 202. There was no oral argument. Fed. R. Civ. P. 78. For the reasons set forth herein, Defendants' motions are **GRANTED**.[1]

### I.    BACKGROUND

The Plaintiffs in this case are former graduate students in the Rutgers University Anthropology Department. This case arises out of the CBM Defendants' representation of

---

[1] All disputed facts have been construed in Plaintiffs' favor. Where Plaintiffs dispute a fact without providing a specific citation to the record to support the denial, the Court accepts these facts as undisputed. See Friedman v. Bank of Am., N.A., No. 09-2214, 2012 U.S. Dist. LEXIS 40587, at *15-16 n.2 (D.N.J. Mar. 26, 2012). Oesreicher's Supplemental Statement also contains a variety of legal conclusions and conclusions of law, which the Court disregards, but portions of his statement comply with L. Civ. R. 56.1(a). The Court considers those portions.

Rutgers, The State University of New Jersey ("Rutgers" or the "University") in its dismissal proceedings against former professor William Powers ("Powers") and in a lawsuit Powers filed against Rutgers.

Beginning in 1994, Rutgers students, including Green and Oestreicher, complained that Powers had acted inappropriately towards them.  An internal Rutgers' investigation proceeded. During that investigation, Powers brought a federal lawsuit against Rutgers, its officers, and administrators.  In 1997, Rutgers filed disciplinary charges against Powers and a hearing before a faculty panel commenced.  Ultimately, these actions were amicably resolved between Rutgers and Powers.

Plaintiff Green, who earned her doctoral degree from Rutgers in 2001, was a witness in the dismissal proceedings and a non-party deponent in the federal lawsuit.  Defs.' Green Statement ¶¶ 1, 56-57.  Plaintiff Oestreicher, who earned his doctoral degree from Rutgers in 1995, was also a witness in the dismissal proceedings.  Defs.' Oest. Statement ¶¶ 1-2, 37.  In this action, Plaintiffs assert a legal malpractice and breach of constructive trust/fiduciary duty claim against CBM based on CBM's alleged representation of them.

### i. Rutgers's Internal Investigation and Issuance of Sanctions

The genesis of these proceedings was a sexual harassment complaint filed in May 1994 by Green against Powers.  Defs.' Green Statement ¶ 7.  In October 1994, Rutgers rendered a decision and sanctioned Powers, prohibiting him from accepting new graduate students for a period of three years.  Defs.' Green Statement ¶¶ 8-9.  Green appealed this decision in accordance with Rutgers' administrative procedures.  Defs.' Green Statement ¶ 10.  Based on this appeal, Assistant Vice President Jean Ambrose ("Ambrose") conducted an additional investigation and issued two reports, one relating to Green's appeal and the other detailing Powers' conduct towards other

present and former students, including Oestreicher.  Defs.' Green Statement ¶¶ 11-12.  CBM was not involved in this internal investigation.

### ii. *Powers' Federal Lawsuit Against Rutgers*

In 1996, Powers sued Rutgers in federal court.  Defs.' Oest. Statement ¶ 17.  Neither Oestreicher nor Green were named as defendants in the lawsuit.  Defs.' Oest. Statement ¶ 19. Green, however, was subpoenaed to testify as a witness at a deposition.  Defs.' Green. Statement ¶ 21.  Prior to her deposition, Green consulted with and obtained legal advice from Emily Alman, Esq., an attorney, in regard to her anticipated testimony.  Defs.' Green Statement ¶ 22.  Alman attended Green's deposition, where she identified herself as Green's attorney.  Defs.' Green Statement ¶¶ 23-24; Defs.' Oest. Statement ¶ 21.  During the deposition, when Green was asked about her arrangement with Attorney Alman, Green explained that, "[s]he's representing me." Defs.' Green Statement ¶ 25.

### iii. *Dismissal of Powers from Rutgers and Request for Hearing*

On January 2, 1997, Rutgers President Francis Lawrence ("President Lawrence") dismissed Powers from his tenured employment at Rutgers.  Defs.' Green Statement ¶ 28.  In accordance with his rights under the University's regulations, Powers requested a public hearing before tenured faculty members.  Defs.' Green Statement ¶¶ 29-30, 32.  Pursuant to the regulations, the panel conducts the hearing, makes the determination as to whether or not the President's charges are true, considers the faculty member's record and recommends to the Rutgers's Board of Governors whether the faculty member should be dismissed, or if other action should be taken. Defs.' Green Statement ¶ 33.

### iv. *Dismissal Hearings of William Powers*

In 1997, the University hired the CBM Defendants to represent it at the public hearings in support of President Lawrence's charges against Powers. Defs.' Oest. Statement ¶ 40. Celauro was the primary CBM attorney who presented the President's dismissal charges. Defs.' Oest. Statement ¶ 42. CBM attorney Irving Hurwitz became involved in presenting the charges in September 1997. Defs.' Oest. Statement ¶ 43. The only two parties to the dismissal proceedings were Rutgers and Powers. Defs.' Oest. Statement ¶ 36.

On June 23, 1997, Rutgers sent a letter to several former and current students explaining that a hearing was set, that CBM would be presenting evidence in support of the President's charges against Powers, and that CBM would be contacting the students to discuss their testimony. See, e.g., Dkt. No. 198-10, Eapen Cert. Ex. 7. Oestreicher and Green both voluntarily testified as witnesses during the proceedings. Defs.' Oest. Statement ¶¶ 37, 64, 99; Defs.' Green Statement ¶ 56-57. Green claims she felt that she had to testify in order to get relief for her sexual harassment complaint. Defs.' Green Statement ¶ 56-57. Green knew that Rutgers sought only to dismiss Powers at these proceedings; she would not be able to obtain money damages. Defs.' Green Statement ¶¶ 36-37. Oestreicher also knew the panel's authority was limited to determining whether Powers' should be dismissed. Defs.' Oest. Statement ¶ 33.

CBM never told Oestreicher they represented him in connection with the dismissal hearings. Defs.' Oest. Statement ¶ 49; Pls.' Oest Statement ¶ 49. Oestreicher's father, Julius Y. Oestreicher, Esq., claims he had a conversation with Vice President Jean Ambrose where Ambrose said that it was not necessary for his son to get an attorney to represent him in the dismissal hearings because the University would be acting on his son's behalf. Pls.' Oest. Statement ¶¶ 38-39, 49; Dkt. No. 203-2, Menna Cert., Ex. B., Julius Y. Oestreicher Cert., dated March 9, 2000 ("J. Oest. 2000 Cert."), ¶ 4.

CBM sent letters to the students, including Oestreicher and Green, to schedule testimony at the hearings and to discuss that testimony in advance. Defs.' Oest. Statement ¶ 67; Defs.' Green Statement ¶ 58. Rutgers provided CBM with all written documents and witness statements it had received from present and former graduate students during its own internal investigation, before it hired CBM. Defs.' Green Statement ¶ 55; Defs.' Oest. Statement ¶ 63.[2] CBM then met with former and present graduate students, including Oestreicher and Green, to review their potential testimony in support of the President's charges against Powers. Defs.' Oest. Statement ¶ 62; Defs.' Green Statement ¶ 54. Green met with Celauro first at the office of her attorney, Emily Alman. Pls.' Green Statement ¶ 41. She then met with Celauro, Rutgers' University Counsel, and Attorney Alman at Rutgers' offices. Pls.' Green Statement ¶ 41.

Oestreicher met with CBM in July 1997 and September 1997. Defs.' Oest. Statement ¶¶ 86, 87, 98. As part of the preparation sessions, CBM sent a fax to Oestreicher that included the client-matter number for Rutgers's dismissal proceedings against Powers.[3] Defs.' Oest. Statement ¶ 68. In this action, Oestreicher testified that he "assumed" it was his individual client number, but never verified this with CBM. Defs.' Oest. Statement ¶ 69, 71.[4] Oestreicher also prepared a

---

[2] The University considered these documents "confidential" because they were subject to the Family Educational Right and Privacy Act, 20 U.S.C. § 1232g, and/or contained private information concerning students, which was normally not made public. Oest. Supp. Statement ¶ 143; Dkt. No. 203-49, Menna Cert. Ex. cc. A protective order was eventually entered in the federal suit to protect these documents. Pls.' Green Statement ¶ 55. In addition, at the dismissal hearings, Celauro later explained the University's confidentiality obligations to the students and how the school was protecting the students' confidential materials. Dkt. No. 203-14, Menna Cert. Ex. L, August 15, 1997, Hearing Transcript at 586-87.

[3] Oestreicher denies this fact without any citation to the record to support his denial. Pl's. Oest. Statement ¶ 68. The Court therefore accepts Defendants' claim that the client-matter number belonged to Rutgers as admitted.

[4] In a different fax cover sheet from CBM to Powers' attorney, Alan Compagnon, Esq., discussing settlement between Rutgers and Powers, CBM used the same client number, 251-82, that Oestreicher saw on the fax to him. See 203-23, Menna Cert. Ex. U.

document titled "Threats, Intimidation, and Interference with Those Seeking Redress of Grievances" and brought a version of this document to a meeting with Celauro on July 10, 1997. Defs.' Oest. Statement ¶¶ 85-86.   Oestreicher said that he became concerned with the confidentiality of the document and Celauro took it and wrote "ATTORNEY-CLIENT PRIVILEGE" across the top of the first page of the document.[5]  Defs.' Oest. Statement ¶ 87; Pls.' Oest. Statement ¶ 87.  This document was returned to Oestreicher in July 1997.  Defs.' Statement ¶ 95.

Oestreicher and Green had no formal retainer agreement with CBM.  Pls.' Oest. Statement ¶ 45; Pls.' Green Statement ¶ 45.  They also did not receive any writing that set forth the nature and extent of any legal services that CBM would provide them.  Defs.' Oest. Statement ¶ 45; Defs.' Green Statement ¶ 45.  Oestreicher and Green were never billed for any legal services rendered by CBM, nor did they pay any money directly to CBM.  Defs.' Oest. Statement ¶ 46; Defs.' Green Statement ¶ 46.[6]  Rutgers paid all of CBM's legal fees.  Defs.' Oest. Statement ¶ 46; Defs.' Green Statement ¶ 51.  Green certified that "it was clear that the CBM firm has been retained by Rutgers and that Rutgers was paying its fees."  Defs.' Oest. Statement ¶ 48; Defs.' Green Statement ¶ 51.

During the dismissal hearing, on August 15, 1997, in the presence of Green and Oestreicher, Celauro said, "I don't represent Adriana Greci Green, nor do I represent Christopher DeFrancisco or any other witness, I represent the President of the University . . . ."  Defs.' Oest. Statement ¶¶ 72-73; Defs.' Green Statement ¶ 60-62.  Oestreicher and Green state now that they believed this to be a "formality."  Pls.' Oest. Statement ¶ 72; Defs.' Green Statement ¶ 61.  Celauro

---

[5] Celauro disputes writing this phrase.  Defs.' Oest. Statement ¶ 88.  Because all disputes are construed in favor of the non-moving party at this phase, the Court assumes Celauro did write "ATTORNEY-CLIENT PRIVILEGE" on the document.
[6] Oestreicher claims without citation that he was indirectly paying CBM through his tuition to Rutgers.  Pls.' Oest. Statement ¶ 46.

reaffirmed this position at another hearing, on August 25, 1997, in the presence of Green and

Oestreicher.  There, Powers' counsel sought to question Mark Speeney, a former Plaintiff and

Rutgers student like Oestreicher and Green, about his discussions with CBM.  Celauro replied:

> They're not my client.  I'm not their attorney.  There's no attorney-client privilege.  If he wants to ask the witness about a communication that the witness had with me, whether in writing or orally, that's wholly appropriate . . . The parties to the proceedings are the President and Dr. Powers.

Defs.' Oest. Statement ¶¶ 76-77; Defs.' Green Statement ¶¶ 63-64.  Celauro and Hurwitz also

repeatedly identified themselves as the President's representative during the proceedings.  Defs.'

Oest. Statement ¶¶ 78-80; Defs.' Green Statement ¶¶ 65-67.

### 1.  *Oestreicher's Access to Legal Advice*

Oestreicher never solicited legal advice from CBM about potential lawsuits he might file.

Defs.' Oest. Statement ¶¶ 56-57 (citing Dkt. No. 198-39, Eapen Cert. Ex. 35, Evidentiary Hearing,

dated January 24, 2006, at 373:23-374:02, 374:03-06).  He did, however, consult with other

attorneys during the proceedings.  During the dismissal hearings, he spoke with Emily Alman,

Esq., Green's attorney, about possible legal action against Powers and Rutgers.  Defs.' Oest.

Statement ¶ 59.  He also spoke with his father, Julius Y. Oestreicher, Esq., about his testimony and

involvement in the hearings.  Defs.' Oest. Statement ¶¶ 108-109.  In 1993, Oestreicher and his

father consulted with other attorneys regarding the possibility of filing a lawsuit against Powers.

Defs.' Oest. Statement ¶ 8; see also Dkt. No. 203-2, J. Oest. 2000 Cert. ¶ 6.  During the dismissal

hearings, Oestreicher informed CBM that he would not talk to them because he had to talk to his

attorney; he later admitted he was referring to his father.  Defs.' Oest, Statement ¶ 112; Pls.' Oest.

Statement ¶ 112.  On May 18, 1998, Attorney Julius Oestreicher wrote a letter on his firm's

letterhead to the panel, stating, "I write this letter as Attorney for my son David Oestreicher"

seeking to allow his son to rebut witness testimony.  Defs.' Oest. Statement ¶ 114.  In his letter, Julius Oestreicher referred to CBM as "counsel for the University."  Defs.' Oest. Statement ¶ 117. The panel denied Julius Oestreicher's request.  Defs.' Oest. Statement ¶ 118.

### 2.  Green's Access to Legal Advice

After the depositions in the federal suit, Green continued to seek guidance from Attorney Alman.  Defs.' Green Statement ¶ 69.  During the dismissal proceedings, Alman identified herself as Green's attorney, addressed the panel as Green's attorney, and referred to Green as her "client." Defs.' Green Statement ¶¶ 72, 79, 83.  Attorney Alman was also identified as, and referred to herself as, Green's "advisor," which enabled her to speak on Green's behalf before the panel.  Pls.' Green Statement ¶ 72, 79, 83.  Green was present when Alman identified herself as her attorney. Defs.' Green Statement ¶ 80.  Attorney Alman also provided Green with advice relating to the dismissal hearings and Green's concerns about Powers.  Defs.' Green Statement ¶ 70.  Attorney Alman also attended Green's meetings with CBM.  Defs.' Green Statement ¶¶ 71, 74.  In addition, Green's testimony at the dismissal hearings was always cleared with Attorney Alman and set around her schedule.  Defs.' Green Statement ¶ 73.  The panel also referred to Alman as Green's attorney and let Alman stay in the room when everyone was asked to leave except attorneys.  Defs.' Green Statement ¶¶ 75, 77.

Oestreicher also understood that Attorney Alman represented Green during the hearings. Defs.' Green Statement ¶ 76; Defs.' Oest. Statement ¶ 124.  Celauro referred to Alman as "attorney for Adriana Greci Green."  Defs.' Green Statement ¶ 78.  Attorney Alman also proffered a number of objections on Green's behalf during the hearings.  Defs.' Green Statement ¶ 82.  For instance, at one hearing Alman objected to admission of testimony on Green's teaching abilities saying "[m]y client is here as a witness to certain events."  Defs.' Green Statement ¶ 85.

### v. **Resolution of Hearings and Federal Lawsuit**

In June 1998, after the hearing concluded but before a decision was released by the panel, CBM and Powers' attorney, Alan Compagnon, conducted settlement negotiations.[7]  Pls.' Oest. Statement ¶ 131.  The final agreement settled the federal lawsuit and dismissal proceedings between Rutgers and Powers.  Defs.' Oest. Statement ¶¶ 131-32.  It was executed on June 15, 1998, between William and Marla Powers, Rutgers, on behalf of Rutgers, Rutgers' employees and officers.  Eapen Cert. Ex. 23, Settlement Agreement and General Release, at 12.  Green and Oestreicher were not listed as parties in the final settlement agreement.   The only language in the settlement agreement that concerned them, arguably aside from general confidentiality provisions, provided immunity for students who "participated or testified in the proceedings."  Id.  The agreement did not mention Green or Oestriecher by name.  Id.  Oestreicher and Green did not learn about it until after it had been executed.  Id.; Pls.' Oest. Statement ¶ 131.

### vi. *Plaintiffs Initiate Suit against Powers and Rutgers*

By mid-July 1998, Oestreicher, Green, and several other students, decided to find an attorney to sue Rutgers and Powers.  Defs.' Oest. Statement ¶ 143; Defs.' Green Statement ¶ 101.  In August 1998, Oestreicher and Green retained the services of Attorney Alman, who had represented Green during the hearings, to draft a complaint against Rutgers and Powers.  Defs.' Oest. Statement ¶ 144; Defs.' Green Statement ¶¶ 102-103.  Attorney Alman assured them that she "would meet all the relevant statutes of limitation and file a Complaint by sometime in

---

[7] Oestreicher and Green cite to portions of draft settlement proposals that purport to be resolving the dismissal hearings, federal suit and "the case of the students."  Pls.' Oest. Statement ¶ 131.  The actual language of the negotiations, however, shows that CBM was attempting to preclude Powers and his wife from suing any of the students involved in the dismissal hearings after this case was resolved.  See Dkt. No. 203-23, Menna Cert. Ex. U.  In any event, this was language debated by lawyers in exchanging drafts and not even included in the final settlement agreement.  Dkt. No. 199-21, Eapen Cert. Ex. 18.

December 1998." Defs.' Oest. Statement ¶ 144; Defs.' Green Statement ¶¶ 102-103. Alman never filed a complaint or a notice of tort claim and never sent a demand to Rutgers or Powers on behalf of Oestreicher and Green. Defs.' Oest. Statement ¶ 145. In February 1999, Oestreicher, Green, and the other students decided to seek new counsel to represent their interests. Defs.' Oest. Statement ¶ 146. On March 25, 1999, Oestreicher, Green and other students retained the law firm of Katich, Werse, & Petillo ("KWP") to pursue a civil action on their behalf. Defs.' Oest. Statement ¶ 147. On May 26, 1999, KWP filed a complaint on behalf of the students in New Jersey Superior Court, Middlesex County, which named Rutgers, Powers, and several other employees of Rutgers as defendants. Defs.' Oest. Statement ¶ 148. KWP did not serve a notice in compliance with the New Jersey Tort Claims Act and did not write any demand letter to Rutgers or Powers. Defs.' Oest. Statement ¶ 149.

CBM defended Rutgers in the state action filed by Plaintiffs against Rutgers and Powers. Defs.' Oest. Statement ¶ 150. On February 5, 2001, Plaintiffs filed an Amended Complaint, which named additional defendants including Attorney Alman, the law firm of KWP, and CBM. Defs.' Oest. Statement ¶ 154; Pls.' Oest. Statement ¶ 154. Oestreicher and Green filed three counts against CBM: breach of constructive trust/fiduciary duty (Count Seven), legal malpractice (Count Eighteen), and breach of ethical obligations (Count Nineteen). Defs.' Oest. Statement ¶ 158. On March 5, 2002, this action was removed to this Court. Dkt. No. 1, Notice of Removal.

In January 2005, Plaintiffs moved to disqualify CBM as counsel for Rutgers, alleging that CBM's attorney-client relationship with the Plaintiffs during the dismissal proceedings barred them from representing Rutgers. Dkt. No. 42. After conducting a four-day evidentiary hearing, the District Court found that there was no attorney-client relationship, express or implied, between Plaintiffs and the CBM Defendants, and denied Plaintiffs' motion to disqualify CBM. Dkt. No.

65.   Thereafter, on November 9, 2006, based on its earlier finding of implied attorney-client relationship, the District Court granted CBM's motion for summary judgment and dismissed all of Plaintiffs' claims against CBM Defendants.  Dkt. Nos. 99-100; Defs.' Oest. Statement ¶ 205. After settling with the remaining Defendants, the Plaintiffs appealed.  Defs.' Oest. Statement ¶ 216.

On March 10, 2010, the Third Circuit Court of Appeals vacated the order granting summary judgment and remanded to the District Court for further proceedings.  Defs.' Oest. Statement ¶ 217.  The Third Circuit held that Plaintiffs' claims were not barred by the law of the case doctrine because Plaintiffs "did not have a full and fair opportunity to litigate the merits of their malpractice and breach of fiduciary duty claims," and the lower court did not consider whether the new evidence presented an exception to the law of the case doctrine.  Defs.' Oest. Statement ¶ 218.   The Plaintiffs and CBM Defendants subsequently engaged in additional discovery.  Defs.' Oest. Statement ¶ 220.  This renewed summary judgment motion was filed thereafter, seeking to dismiss all claims against CBM.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Id.  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.  Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 249 (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party.  Hip Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey, 693 F.3d 345, 351 (3d Cir. 2012).  Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. See Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing Anderson, 477 U.S. at 249); Big Apple BMW v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.    **ANALYSIS**

Defendant CBM moves for summary judgment dismissing with prejudice Plaintiff Oestreicher and Green's claims of legal malpractice (Count Eighteen) and breach of constructive trust/fiduciary duty (Count Seven) against the CBM Defendants.  Dkt. Nos. 198, 199.  Plaintiffs oppose this motion.  Dkt. Nos. 201, 202.  The central dispute is whether there was an implied attorney-client relationship between the Plaintiffs and the CBM Defendants.

> **A.  Because there is no implied attorney-client relationship between CBM and Plaintiffs, Plaintiffs' claim for legal malpractice fails as a matter of law.**

New Jersey courts have defined legal malpractice as "negligence relating to an attorney's representation of a client." Sommers v. McKinney, 670 A.2d 99, 103 (N.J. Super. Ct. App. Div. 1996). The elements of a legal malpractice claim are: "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." McGrogan v. Till, 771 A.2d 1187, 1193 (N.J. 2001) (citing Conklin v. Hannoch Weisman, 678 A.2d 1060, 1070 (N.J. 1996)). Thus, to prevail on a legal malpractice claim, there must be an attorney-client relationship that gives rise to a duty of care. See, e.g., Flaherty-Wiebel v. Morris, Downing & Sherred, 384 F. App'x 173, 176 (3d Cir. 2010).

An attorney-client relationship can be express or implied. Montgomery Acad. v. Kohn, 50 F. Supp. 2d 344, 350 (D.N.J. 1999); Ellis v. Ethicon, Inc., No. 05-726, 2005 U.S. Dist. LEXIS 25705 (D.N.J. Oct. 25, 2005). To establish an implied attorney-client relationship "a party must show (1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney." Montgomery Acad., 50 F. Supp. 2d at 350 (quoting Pain Prevention Lab., Inc. v. Electronic Waveform Labs., Inc., 657 F. Supp. 1486, 1495 (N.D. Ill. 1987)); Killion v. Coffey, No. 13-1808, 2014 U.S. Dist. LEXIS 88550, at *17-18 (D.N.J. June 30, 2014). The Court must look at the "conduct of the parties, the surrounding circumstances, statements made by the lawyer, or some combination of all three." Ellis, 2005 U.S. Dist. LEXIS 25705, at *12 (internal citation omitted). The finding of an implied attorney-client relationship requires more than a subjective belief that such relationship exists. Capitol Surgical Supplies, Inc. v. Casale, 86 F. App'x 506, 509 (3d Cir. 2004); Ellis, 2005 U.S. Dist. LEXIS 25705, at *12 (quoting Essex Chem. Corp. v. Hartford Accident & Indem. Co., 993 F. Supp. 241, 253 (D.N.J. 1998)); ("A subjective belief that an attorney-client relationship was

formed is an insufficient basis upon which to find the existence of a genuine issue of material fact precluding summary judgment."); FMC Corp. v. Guthery, No. 07-5409, 2009 U.S. Dist. LEXIS 14609, at *19 (D.N.J. Feb. 24, 2009).  Instead, the belief must be "objectively reasonable under the totality of the circumstances, which includes consideration of the intent of the alleged client and attorney and payment arrangements." Ellis, 2005 U.S. Dist. LEXIS 25705, at *12-13 (quoting Essex Chem. Corp., 993 F. Supp. at 253); see also Ageloff v. Noranda, 936 F. Supp. 72, 76 (D.R.I. 1996).  "[T]he common thread in cases in which a lawyer-client relationship is said to have arisen by implication is reliance by the 'client' on the professional skills of the attorney coupled with the attorney's awareness of that reliance and tacit acceptance of it."  Geranio v. FEC Mortg. Corp., No. A-4839-06T2, 2009 N.J. Super. Unpub. LEXIS 74, at *9-10 (App. Div. Feb. 18, 2009); Robinson v. Hornell Brewing Co., No. 11-2183, 2012 U.S. Dist. LEXIS 2656, at *6-7 (D.N.J. Jan. 10, 2012).

After carefully examining the totality of the circumstances, the Court is satisfied that there is no implied attorney-client relationship here.  Giving Plaintiffs the benefit of all possible inferences from the undisputed evidence, the Court finds that there is no objectively reasonable basis to conclude that an implied attorney-client relationship was formed between Plaintiffs and CBM.

First, CBM repeatedly and consistently advised Plaintiffs that they did not represent them, and that they only represented Rutgers.  An individual cannot reasonably rely upon an attorney who informs the person that the attorney does not represent their interests.  See Casey v. Univ. of Med. & Dentistry of N.J., No. A-3648-12T1, 2010 N.J. Super. Unpub. LEXIS 1866 (App. Div. Aug. 3, 2010) ("If Timpone advised Casey that UMDNJ, not Casey, was [his] client, then any conduct implying otherwise, short of retraction, could not defeat Timpone's express denial of the

14

acceptance of any professional responsibility as to Casey."); <u>Home Care Indus., Inc. v. Murray</u>, 154 F. Supp. 2d 861, 869 (D.N.J. 2001) (noting that the firm could have protected its position by revealing its loyalty was to the corporate client); <u>FMC Corp. v. Guthery</u>, No. 07-5409, 2009 U.S. Dist. LEXIS 14609, at *12-20 (D.N.J. Feb. 24, 2009) (denying motion to disqualify finding it was unreasonable for Defendant to believe attorney-client relationship with Plaintiff's counsel because, <u>inter alia</u>, the attorney for Plaintiff told Defendant several times that he did not represent him).

During the proceedings, in the presence of Green and Oestreicher, Celauro explicitly stated that "I don't represent Adriana Greci Green, nor do I represent Christopher DeFrancisco or any other witness, I represent the President of the University . . . ." She later reaffirmed this position at another hearing, explaining there was no attorney-client privilege between communications she had with any of the witnesses. Moreover, throughout the proceedings, CBM repeatedly referred to themselves as counsel for the University and the President only. Green and Oestreicher never objected to those statements. The Court finds that CBM's express statements rendered objectively unreasonable any reliance by Green or Oestreicher on CBM as their attorneys.

Second, at the same time that CBM expressly disclaimed that they represented Plaintiffs and made clear that they only represented Rutgers, Plaintiffs retained their own attorneys who expressly stated that they represented each of the Plaintiffs. <u>See</u> <u>FMC Corp. v. Guthery</u>, No. 07-5409, 2009 U.S. Dist. LEXIS 14609, at *18 (D.N.J. Feb. 24, 2009) ("The fact that [Defendant] had personal attorneys is relevant to the question of whether it was reasonable for him to believe that [the law firm] was acting as his attorney."); <u>In re Silverman</u>, 113 N.J. 193, 219 (1988) (finding claim of attorney-client relationship could be rebutted by client's decision to retain independent counsel and other outside legal advice). An implied attorney-client relationship cannot arise if the non-client is "too remote from the attorneys to be entitled to protection." <u>Petrillo v. Bachenberg</u>,

139 N.J. 472 (1995). A non-client's relationship with a putative attorney may be too remote if the non-client obtains representation from independent counsel because this obviates the need to rely on legal advice from another attorney. See O'Dowd, 2014 N.J. Super. Unpub. LEXIS 2595, at *20 ("[W]e find that remoteness exists because plaintiff was represented by his own counsel and . . . . Thus, we conclude summary judgment was properly granted as the Firm owed no duty to plaintiffs.").

Here, both Green and Oestreicher had their own attorneys during the dismissal proceedings. Oestreicher sought advice from other attorneys at the very same time he alleges that CBM represented him. Oestreicher consulted with his father, Attorney Julius Y. Oestreicher, Esq., about his testimony and involvement in the hearings. In 1993, before the dismissal hearings commenced, Oestreicher and his father consulted with other attorneys regarding the possibility of retaining them to pursue a suit against Powers. During the hearings, Oestreicher referred to his father as his attorney. Julius Oestreicher, Esq., also submitted a letter to the panel as "Attorney for [his] son David" because Oestreicher was concerned about the admission of certain evidence. The fact that Oestreicher's attorney was his father and arguably provided paternal advice as well does not change the objective fact that Oestreicher sought legal advice from his father.

Oestreicher also spoke to Attorney Alman, Green's attorney, during the hearings about possible legal action against Powers and Rutgers. Even though Attorney Oestreicher and Attorney Alman did not enter an appearance on behalf of Oestreicher at the dismissal proceedings, Oestreicher had access to both for legal advice before and during the proceeding.[8] Conversely, Oestreicher never solicited any legal advice from CBM. He also did not object when CBM

---

[8] As discussed infra, after the settlement between Rutgers and Powers, Oestreicher, Green, and the several other students enlisted the services of Alman to draft a Complaint against Rutgers and Powers.

announced that they did not represent him.  These actions demonstrate a lack of relationship with CBM, a lack of reliance on CBM, and a lack of foreseeability by CBM that they may be representing Oestreicher.

Like Oestreicher, Green also had an attorney during the proceedings.[9]  During the hearings, Attorney Alman specifically identified herself as Green's attorney and addressed the panel as Green's attorney.  Alman also referred to Green as her "client."  Green was present when Attorney Alman made these statements and never objected to them.  The panel, Celauro, and Oestreicher also referred to Alman as Green's attorney.  When Celauro explained that CBM did not represent Green, Green did not object.  Green did not solicit legal advice from CBM.  Instead, Attorney Alman provided Green with advice and guidance about the hearings and about Green's concerns regarding Powers.  Alman, as counsel, attended Green's meeting with CBM.  Green's testimony at the hearing was set around Attorney Alman's schedule.  Alman also proffered objections on Green's behalf during the hearings.  Alman's involvement in the proceedings undermines the possibility that CBM could foresee Green's reliance on the firm or that Green could have an objectively reasonable belief that CBM represented her.

Moreover, neither Oestreicher nor Green sought any legal advice from CBM after the hearings were over.  After Rutgers and Powers entered into a settlement agreement, the Plaintiffs decided to find an attorney to sue Rutgers and Powers.  Despite their dissatisfaction with the settlement, neither Oestreicher nor Green contacted CBM again.  Instead, Oestreicher, Green, and several other students, retained Attorney Alman to draft a complaint against Rutgers and Powers.  After Alman failed to file a complaint, they retained yet another law firm, KWP, to represent their

---

[9] As discussed supra, Alman also served as Green's attorney during Green's deposition in Powers' federal lawsuit against Rutgers.

interests and file suit against Rutgers and Powers.  There is no evidence to suggest that Oestreicher or Green attempted to utilize CBM to assist them with this action, which is further proof that an attorney-client relationship never existed with CBM in the first place.

In support of Oestreicher and Green's claim that CBM's representation of Rutgers created an implied attorney-client relationship with them, Plaintiffs point to: (1) their meetings with CBM to prepare for the dismissal hearing, (2) representations made by the University about CBM, and (3) two specific pieces of evidence—a client number on a fax and an "ATTORNEY-CLIENT PRIVILEGE" designation on a document.  Viewed together, and in light of the surrounding circumstances, none of these facts support a finding that an implied attorney-client relationship existed here.

First, the fact that Oestreicher and Green met with CBM as witnesses did not create, in and of itself, an implied attorney-client relationship.  The University retained CBM to represent it at the public hearings to support President Lawrence's dismissal charges against Powers.[10]  The hearing was instituted pursuant to University regulations and procedures to determine if Powers should be detenured and dismissed from the University.  The only actual parties to the proceedings were Rutgers and Powers.  Most of the charges against Powers, however, were based on complaints made by current and former graduate students, including Green and Oestreicher.  Thus, in order to substantiate the charges, it was necessary for the students, including Plaintiffs, to work with CBM and testify as witnesses in the proceedings.

---

[10] CBM also represented Rutgers in the federal suit initiated by Powers in 1996.  Neither Oestreicher, Green, nor any other students were named as defendants in that suit.  Green, however, was subpoenaed to testify at a deposition in the case, where she was represented by Attorney Alman.

There is no factual dispute that Oestreicher and Green participated in the proceedings as witnesses.  As stated above, CBM made clear, on the record, that they did not represent the students, including Plaintiffs, and only represented Rutgers.  Although Oestreicher and Green voluntarily met with CBM to prepare their witness testimony, and voluntarily turned over documents to Rutgers and CBM, they both had retained their own attorneys at the same time.[11]  Both Oestreicher and Green knew that the authority of the panel was limited to making a determination on Powers' dismissal from the University.  Green also acknowledged that she knew she would not be able to obtain money damages from the hearing.  Plaintiffs do not point to any verbal statements made during those meetings that indicate that CBM represented them.  The objective facts demonstrate that Plaintiffs met with CBM as witnesses for the dismissal hearings and nothing more.

Second, Plaintiffs argue that the representations made by the University and by Assistant Vice President Ambrose prove that CBM represented them.  Specifically, Plaintiffs claim that Ambrose's comments that Green and Oestreicher did not need attorneys at the hearing because CBM would be prosecuting it meant that CBM was representing Plaintiffs individually.  But a party's claim that her attorney represents another party does not, alone, bind the attorney.  "A successful non-client legal malpractice claim requires evidence showing an affirmative act by the attorney."  O'Dowd v. Mandelbaum, 2014 N.J. Super. Unpub. LEXIS 2595, at *16 (emphasis added).  "It is the reasonably foreseeable reliance by the non-client on the attorney's representation that imposes the duty of care."  Id. at *16.  An affirmative act or representation by Rutgers cannot impose a duty of care on CBM.

---

[11] The University, and thus CBM as their attorneys, did have confidentiality obligations to the students pursuant to FERPA, which required them to protect students' records and information from being publicly disclosed.

Third, Oestreicher relies on two specific pieces of evidence to support the existence of an attorney-client relationship between him and CBM.  First, he claims that CBM sent him a fax that had a client-matter number on it, which he believed was his.  It was not, and Oestreicher presents no evidence that the number was his.  The mere existence of a communication with a client-matter number on it does not create an attorney-client relationship.  Second, Oestreicher brought a document to a preparation session with CBM, expressed concerns about confidentiality, and the CBM attorney, Celauro, wrote "ATTORNEY-CLIENT PRIVILEGE" on the document in response. But Celauro's writing "ATTORNEY-CLIENT PRIVILEGE" on the document does not necessarily make the document confidential, nor does it alone create an attorney-client relationship, especially in light of the fact that Oestreicher was meeting with CBM as a witness for the proceeding.  See Giordani v. Hoffmann, 278 F. Supp. 886, 890 (E.D. Pa. 1968) (explaining that "statements made by non-party witnesses to an attorney in preparation for litigation on behalf of the client were considered outside the attorney-client privilege") (citing City of Philadelphia v. Westinghouse Elec. Corp., 210 F. Supp. 483 (E.D. Pa. 1962)); see also Long v. Anderson Univ., 204 F.R.D. 129, 135 (S.D. Ind. 2001) ("In any event, the invocation of the attorney-client privilege to shield this document fails . . . 'for the obvious reason that witnesses' statements are not confidential communications and therefore are, by their very nature, not within the ambit of the attorney-client privilege.'" (quoting Daniels v. Hadley Mem'l Hosp., 68 F.R.D. 583, 586 (D.D.C. 1975)).  Moreover, the University, and thus CBM as the University's attorney, also had separate statutory confidentiality obligations to the students under the Family Educational Rights Protection Privacy Act ("FERPA").  These facts alone are not enough to give rise to an objectively reasonable belief of implied representation, especially in light of CBM's clear disclaiming of representation and the Plaintiffs' other attorneys.  See Ellis, 2005 U.S. Dist. LEXIS 25705, at *12-13 (quoting

Essex Chem. Corp., 993 F. Supp. At 253) (explaining that the belief must be "objectively reasonable under the totality of the circumstances, which includes consideration of the intent of the alleged client and attorney and payment arrangements.").

The existence of an attorney-client relationship is a condition precedent to a finding of legal malpractice. The conduct of the parties, surrounding circumstances, and statements made by the lawyers demonstrate that there was not an objectively reasonable basis for Oestreicher and Green to believe that the CBM Defendants were their attorneys or representing them in the proceedings. Plaintiffs' subjective after-the-fact beliefs cannot alter this finding. Because there is no express[12] or implied attorney-client relationship between CBM and Plaintiffs, Plaintiffs legal malpractice claim fails as a matter of law and CBM's Motion for Summary Judgment is granted as to Plaintiffs' Count Eighteen.

**B. Because there is no fiduciary relationship between Plaintiffs and CBM, Plaintiffs' claim for breach of constructive trust/fiduciary duty fails as a matter of law.**

In order for Plaintiffs to prevail on Count Seven of the Complaint, they must show that the CBM Defendants owed a fiduciary duty to Plaintiffs. In Count Seven, Plaintiffs allege that they:

> entrusted Rutgers and the CBM Attorneys with valuable assets, i.e., his causes of action arising from the misconduct of William Powers . . . Rutgers and the CBM Attorneys had a fiduciary duty to *either* fulfill plaintiffs' trust by attaining financial, equitable and administrative remedies for him or to advise him of their inability to

---

[12] The Court also easily finds that CBM Defendants did not have an express attorney-client relationship with Plaintiffs. Plaintiffs admit that "there was no written confirmation of the existence of a professional relationship." Dkt. No. 202-3, at 20. Plaintiffs did not hire, and could not fire, CBM. The Plaintiffs did not have a formal written retainer agreement or any written documentation of CBM's scope of representation. CBM did not explicitly state that the firm represented Oestreicher or Green—in fact, as explained above, CBM expressly disclaimed that they represented Plaintiffs on the record in Plaintiffs' presence during the dismissal proceedings. In addition, Oestreicher and Green did not receive any bills for legal services, and neither one made any direct payments to CBM for services; Rutgers paid CBM's legal fees. Thus, there is no evidence supporting an express attorney-client relationship between CBM and Plaintiffs.

> accept the trust due to their conflict of interest . . . . [and] Plaintiff relied upon Rutgers and the CBM Attorneys from late 1994 onward and therefore failed to seek or obtain competent advice regarding what causes of action he might have available to him until after the June 1998 settlement.

Dkt. No. 1, Compl. ¶¶ 190-96.

In order to establish a claim for breach of constructive trust/fiduciary duty, a plaintiff must show the existence of a fiduciary relationship.  "A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." Senft v. Fireman's Fund Ins. Co., No. 14-07805, 2015 U.S. Dist. LEXIS 61870, at *9 (D.N.J. May 12, 2015) (quoting F.G. v. MacDonell, 696 A.2d 697, 704 (N.J. 1997)).  "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." Id.  "A violation of that trust constitutes a breach of the duty." Id.  Absent a finding of a fiduciary relationship, however, there would be no breach.

Here, the undisputed facts demonstrate that there was no express or implied attorney-client relationship between Plaintiffs and CBM.  See Part III.A, supra.  Thus, an attorney-client relationship did not impose a fiduciary duty upon CBM Defendants to Plaintiffs.  Plaintiffs must show that a fiduciary relationship existed between Plaintiffs and the CBM Defendants in some other way.

In New Jersey, Petrillo v. Bachenberg is the "leading authority on the subject" of an attorney's duty to a non-client.  DeAngelis v. Rose, 320 N.J. Super. 263, 276 (App. Div. 1999); see also Petrillo, 139 N.J. at 472.  The New Jersey Supreme Court defined the scope of a lawyer's duty to non-clients as follows:

> Attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorney's

> representations and the non-clients are not too remote from the attorneys to be entitled to protection. . . [A] lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services.

Petrillo, 139 N.J. at 483-84.  Thus, the focus is the non-client's reliance on the attorney's work or representations.

For the reasons set forth above, there are no facts to support the finding that CBM should have known that Green or Oestreicher would rely on them for legal advice or that such reliance was foreseeable.  CBM expressly informed Oestreicher and Green, on more than one occasion during the dismissal proceedings, that CBM did not represent them.  They also repeatedly referred to themselves as attorneys for the University.  CBM never retracted those statements.  Oestreicher and Green did not seek legal advice from the CBM Defendants regarding any potential claims they may have against Powers.  Oestreicher and Green both consulted with other attorneys during the hearings.  Oestreicher consulted with his father, Julius Oestreicher, Esq., and with Alman, Green's attorney.  Green was represented by Alman before, during, and after the dismissal hearings.  Plaintiffs' reliance on legal advice from other attorneys, instead of CBM, makes Plaintiffs' alleged reliance on CBM's counsel objectively unreasonable.

In order to be entitled to protection, a non-client must not be "too remote from the attorney[]."  O'Dowd, 2014 N.J. Super. Unpub. LEXIS 2595, at *18-19 (App. Div. Oct. 31, 2014) (quoting Petrillo v. Bachenberg, 139 N.J. 472, 484 (1995)); Banco Popular N. Am. v. Gandi, 184 N.J. 161, 180 (2005) ("[A]ttorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys['] representations and the non-clients are not too remote from the attorneys to be entitled to protection.").

Here, Green's attorney-client relationship with Attorney Alman, and Oestreicher's relationship with both Attorney Alman and Attorney Julius Oestreicher, demonstrates that

23

Plaintiffs' relationship with CBM was too remote to create an attorney-client relationship.  See O'Dowd, 2014 N.J. Super. Unpub. LEXIS 2595, at *18-19 (App. Div. Oct. 31, 2014) (finding that the plaintiff did not need to rely on the firm for legal advice because he had his own counsel to review documents and monitor the project which created a "remoteness" and no duty owed to plaintiff).

Based on the totality of the circumstances, there is no factual dispute that the CBM Defendants should not have known that Plaintiffs were relying on CBM for legal advice and Oestreicher and Green's reliance was not foreseeable.[13]  Under Petrillo, there are no facts to support the conclusion that the CBM Defendants owed a duty of care to Oestreicher and Green as non-clients.  Plaintiffs fail to allege any other grounds upon which the CBM Defendants owed Plaintiffs a fiduciary duty.  Accordingly, CBM's Motion for Summary Judgment is granted as to Plaintiffs' Count Seven for breach of constructive trust/fiduciary duty.

IV.    **CONCLUSION**

For the reasons set forth above, Defendants' Motions for Summary Judgment are **GRANTED**.  This matter is therefore dismissed and the case is closed.  An appropriate order will follow.

*/s Madeline Cox Arleo*
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

[13] In addition, Plaintiffs fail to identify what legal advice they were actually relying on CBM for. In fact, Plaintiffs both admit that they did not seek legal advice from CBM regarding any potential actions they may have against Rutgers.

24